Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANTS:

**JOANN M. PRICE**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS, Central Administration
Indianapolis, Indiana

**EUGENE M. VELAZCO, JR.**
DCS, Lake County Office
Gary, Indiana

ATTORNEY FOR CASA:

**DONALD W. WRUCK**
Dyer, Indiana



FILED
Sep 20 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENT-CHILD RELATIONSHIP OF Ge.S. & O.S., Minor Children | ) ) ) ) |
| and | ) ) |
| G.S., Mother, | ) ) |
| Appellant, | ) ) |
| vs. | ) )   No.  45A03-1201-JT-11 ) |
| THE  INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee. | ) ) |

APPEAL FROM LAKE SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Judge
Cause Nos. 45D06-1011-JT-201 and 45D06-1011-JT-202

**September 20, 2012**

**MATHIAS, Judge**

G.S. ("Mother") appeals the involuntary termination of her parental rights to her children, G.S. and O.S., claiming there is insufficient evidence supporting the juvenile court's judgment. We affirm.

## Facts and Procedural History

Mother is the biological mother of G.S., born in March 2008, and O.S., born in December 2009. The facts most favorable to the juvenile court's judgment reveal that following O.S.'s birth, the local Lake County office of the Indiana Department of Child Services ("LCDCS") was notified by hospital officials that O.S. was born testing positive for cocaine. Mother, too, had tested positive for cocaine at O.S.'s birth. During LCDCS's ensuing assessment, Mother admitted to having a history of substance abuse, including using cocaine from the age of twenty-four. Mother also reported that she had used crack-cocaine throughout the beginning of her pregnancy, and that she did not know the paternity of either of the children.[1] As a result of its investigation, LCDCS took both children into emergency protective custody and filed petitions alleging G.S. and O.S. were children in need of services ("CHINS").

---

[1] G.S.'s biological father remains unknown. During the underlying proceedings, the biological father of O.S. was determined to be A.C. The juvenile court terminated the parental rights of both children's biological fathers in its November 2011 termination order. Neither father participates in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

During a hearing in January 2010, Mother admitted to the allegations of the CHINS petitions, and the children were so adjudicated. The juvenile court proceeded to disposition the same day and thereafter issued an order formally removing G.S. and O.S. from Mother's care and custody, retroactive to the date of their removal in December 2009. As part of its dispositional order, the juvenile court also directed Mother to participate in and successfully complete a variety of tasks and services designed to address her parenting and substance abuse issues, a process the juvenile court hoped would facilitate reunification of the family. Specifically, Mother was ordered to, among other things: (1) successfully complete a substance abuse evaluation and any recommended treatment; (2) submit to random drug screens; (3) undergo a psychological evaluation; (4) participate in parenting classes and individual counseling; and (5) exercise regular supervised visitation with the children.

During the ensuing CHINS case, Mother failed to demonstrate any enduring commitment to completing court-ordered services and achieving reunification with the children. For example, Mother was "really evasive" during her psychological assessment, and it took three attempts on three different dates just to complete the evaluation. Tr. p. 48. In addition, Mother failed to participate in the recommended individual counseling by failing to show for all but one of her scheduled appointments. As for parenting classes, Mother attended only four classes. She also was very inconsistent in attending visits with the children, visiting only twice during the months of December 2009 and January 2010.

Regarding random drug screens, Mother did not make herself available until the end of January 2010 when she tested positive for cocaine. In February 2010, Mother tested positive for cocaine four times and for marijuana once. The following month, Mother tested positive for cocaine and alcohol three times before she was arrested and incarcerated on March 18, 2010, on an outstanding warrant from the Gary Drug Court. Near the time of her incarceration, Mother's referral to Human Beginnings for individual counseling was closed due to her lack of participation and numerous "no shows" for scheduled appointments. Id.

Although Mother was sentenced to twelve months of incarceration, LCDCS case managers were able to work with the Drug Court and make arrangements for Mother to serve her sentence through the Transitions in-patient program in Fort Wayne. At Transitions, Mother would be able to complete her parenting classes, participate in individual counseling, and exercise visitation with the children while simultaneously serving her criminal sentence. Mother entered the Transitions program in late-April 2010, but four weeks later she was discharged from the program prior to completion due to her bizarre behavior culminating in a psychotic episode.

Immediately following this episode, Mother was transported to Parkview Behavioral Health Center where she underwent a psychiatric evaluation and was diagnosed with a mood disorder, borderline personality disorder, and substance abuse dependency. The evaluator recommended further psychological and psychiatric evaluations to help Mother address her mental health issues, explaining that these issues

4

needed to be resolved before Mother could effectively address her substance abuse problems. Because the Transitions program was not equipped to deal with Mother's psychiatric problems, Mother was returned to the Lake County Jail. Sometime later, Mother was permitted to participate in a work release program but was returned to jail after her involvement in an altercation with another inmate. Mother served the remainder of her sentence in jail and was released from incarceration in November 2010. Meanwhile, in July 2010, the juvenile court approved LCDCS's recommendation to change the children's permanency plans from reunification to termination of parental rights and adoption.

Notwithstanding this change in permanency plans, LCDCS and the juvenile court continued to offer Mother services as a final "new chance" to "achieve her goal of sobriety and getting her children back" following her release. Id. at 73. To that end, Mother completed parenting classes and began participating in individual counseling. In addition, the juvenile court ordered Mother to complete the in-patient substance abuse treatment program she had begun with Transitions. Transitions, however, would not accept Mother back into its program until Mother addressed her mental health issues and obtained an updated psychological/psychiatric evaluation.

In January 2011, Mother submitted to a psychiatric examination with Dr. Martha Hernandez. Based on this assessment, Dr. Hernandez recommended that Mother participate in long-term inpatient and outpatient programs due to her dual diagnosis of mental health and substance abuse issues. It was also recommended that Mother undergo

5

a neurological examination to determine if the deficits Mother was displaying were "organic." Id. at 77. Mother was subsequently referred to various mental health and substance abuse treatment programs.

Mother's participation in these referrals, however, was sporadic and ultimately unsuccessful. For example, Mother completed a two-week inpatient substance abuse treatment program with Regional Mental Health Center, which was to be immediately followed by an eight-week intensive outpatient program. Although Mother was expected to attend classes four days per week during the outpatient treatment program, she only appeared for a handful of classes during the months of May and June 2011, none in July, three in August, and two in September. Ultimately, Mother completed only twelve of the thirty-two required classes. As a result of this sporadic participation in outpatient treatment, Regional Mental Health declined to provide Mother with any psychiatric and individual counseling to address her mental health issues.

Mother also continued to use cocaine and alcohol throughout 2011, failing several random drug screens in February, March and August 2011. A ninety-day hair follicle test, which covered the months of May through August 2011, likewise came back positive for cocaine. In addition, Mother tested positive for alcohol in October 2011.

A consolidated evidentiary hearing on the termination petitions commenced in November 2011. During the termination hearing, LCDCS presented substantial evidence concerning Mother's history of substance abuse, prior involvement with LCDCS concerning two older children, and ongoing mental health and substance abuse issues.

6

The evidence also established that Mother (1) had not visited with the children since March 2011 when her visitation privileges were cancelled after the court learned Mother had attended a visitation with cocaine in her system; (2) was essentially unemployed, working occasionally for neighbors and depending upon family members to pay her utilities; and (3) had failed to successfully complete a majority of the trial court's dispositional goals. Finally, LCDCS presented evidence showing that the children were living together, thriving, and bonded with their pre-adoptive foster mother.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. Approximately two weeks later, the court entered its judgment terminating Mother's parental rights to both children. Mother now appeals.

**Discussion and Decision**

When reviewing a judgment terminating parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

When a juvenile court's judgment contains specific findings of fact and conclusions thereon, as is the case here, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we

7

determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

> (B)　that one (1) of the following is true:
>
> > (i)　There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

8

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B)-(D).[2]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).  "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship."  Ind. Code § 31-35-2-8(a) (emphasis added).  Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsections (b)(2)(B) and (D) of the termination statute cited above.

### I. Sufficiency of the Evidence - Conditions Remedied

In challenging the sufficiency of the evidence supporting the juvenile court's determination that there is a reasonable probability the conditions resulting in the children's removal will not be remedied, Mother claims that the juvenile court's findings, in general, were "unfounded" and "unreasonable."  Appellant's Br. at 6.  Mother further

---

[2]  Indiana Code section 31-35-2-4 was amended by Public Law No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

asserts that LCDCS's services inappropriately focused primarily on treatment of Mother's substance abuse issues, rather than her mental health issues. Mother therefore contends she is entitled to reversal.

We begin our review by observing that Indiana's termination statute requires the juvenile court to find only one of the three requirements of Indiana Code section 31-35-2-4(b)(2)(B) to be established by clear and convincing evidence before it can properly terminate parental rights. See id. Because we find it to be dispositive under the facts of this case, we only consider whether LCDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in the children's removal or continued placement outside Mother's care will not be remedied. See I.C. § 31-35-2-4(b)(2)(B)(i).

In making such a determination, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The juvenile court may also consider any services offered to the parent by the local Indiana Department of Child

10

Services office (here, LCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, LCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the juvenile court made detailed findings in its judgment regarding Mother's unresolved parenting, substance abuse, and mental health issues. In so doing, the juvenile court acknowledged that the children were removed from Mother's care at the time of O.S.'s birth, as both O.S. and Mother tested positive for cocaine. The court further found that Mother failed to take advantage of the many services offered to her, was "non-compliant" and "very evasive" with service providers throughout the underlying proceedings, failed to complete "any program for substance abuse rehabilitation," does not have "steady" employment, "depends on others to provide for the utilities on her house," and remains "in denial" of her ongoing "drug problem." Appellant's App. p. ii. The court also found Mother "has psychological problems and has refused to take her psychotropic medication." Id. In addition, the court acknowledged that Mother "was offered every service available for rehabilitation," but "was not amenable to the services." Id. at iii. Finally, the juvenile court found:

> Mother has failed to demonstrate the necessary skills to raise the children. Mother has four children, none of which are in her care. Mother has demonstrated that she could not remain drug free. . . . It is unlikely that any of the parents would be in a position to properly parent these children.

11

Id. A thorough review of the record leaves us satisfied that clear and convincing evidence supports the juvenile court's findings set forth above, which in turn support the court's ultimate decision to terminate Mother's parental rights to both children.

The record makes clear that, at the time of the termination hearing, Mother had made little, if any, progress in demonstrating that she will ever be capable of providing the children with a safe, stable, and drug-free home environment. Specifically, Mother did not have steady employment, failed to successfully complete individual therapy and substance abuse treatment, refused to take her prescribed medication, and had not visited with the children since March 2011. During the termination hearing, LCDCS case manager Monroe confirmed that prior to Mother's incarceration she was "not complying with anything," was "very combative with all of the services," and was "not willing to admit her addiction to cocaine . . . and all of her problems." Tr. p. 58. When asked to explain why LCDCS changed the children's permanency plan from reunification to adoption, Monroe again referred to Mother's "noncompliance," with services, explaining that "[o]ther than [Mother] being drug[-]free, because she could not use drugs while incarcerated, there was no progress. . . . [Mother] was not, uh, consistent with the case plan before her incarceration." Id. Monroe also testified that she had observed Mother "was not bonding with [O.S.] at all" during visits with the children and that Mother had indicated "from the beginning" that she wanted to "give [O.S.] up for adoption . . . but she did want to keep [G.S.]." Id. at 58-59. Similar testimony was likewise provided by visit supervisors.

12

Moreover, Mother admitted during the termination hearing that she had failed to complete any of the recommended substance abuse and individual therapy services. She also acknowledged that her current employment consisted solely of working for "some of [her] neighbors" doing "[h]ome healthcare" such as cooking and cleaning. Id. at 176. When asked to describe her client base, Mother indicated that she had two clients, that "everyone else" was "not very consistent" and "may not call and ask for my services." Id. She went on to explain that her rates varied from five dollars to twenty-five dollars for "a couple of hours" of work. Id. at 177. Finally, Mother informed the juvenile court that she believed she had "come a long way" and that she believed she could "with time" complete the long-term drug program and "probably find a medication that would help me keep my emotional psychotic, whatever you guys call this, under control." Id. at 180-81.

As noted earlier, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, LCDCS presented clear and convincing evidence to support the juvenile court's findings and ultimate determination that there is a reasonable probability the conditions leading to G.S.'s and O.S.'s removal or continued placement outside of

13

Mother's care will not be remedied. Mother's arguments to the contrary, including her assertion that LCDCS should have provided more mental health services and focus less on helping Mother overcome her substance abuse issues, amount to an invitation to reweigh the evidence, which we may not do. D.D., 804 N.E.2d at 265; see also In re E.E., 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) (concluding that provision of services is not requisite element of Indiana's termination statute and even complete failure to provide reunification services does not serve to negate necessary element of termination statute).

## II. Best Interests

We next consider Mother's assertion that termination of her parental rights is not in the children's best interests. We are ever mindful that, when determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by the Indiana Department of Child Services and to look to the totality of the evidence. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, however, the court must subordinate the interests of the parent to those of the child. Id. Moreover, we have previously explained that recommendations from the case manager and child advocate that parental rights should be terminated support a finding that termination is in the child's best interests. Id.

Here, in addition to the findings set forth previously, the juvenile court found that Mother "did not bond with [O.S.] and often indicated that she was not interested in parenting this child." Appellant's Appendix pp. ii-iii. The court went on to find that

14

Mother had failed to provide "any emotional or financial support for the children," to "demonstrate the necessary parental skills to raise the children," and to "remain drug free." Id. at iii. As for the children, the court specifically found that they were "bonded in the foster home and are thriving." Id. Based on these and other findings, the juvenile court concluded that it is in the "best interests of the child[ren] and their health, welfare and future that the parent-child relationships . . . be forever fully and absolutely terminated." Id. These findings and conclusions, too, are supported by the evidence.

It was the general consensus of LCDCS case managers and services providers alike that termination of Mother's parental rights was in the children's best interests. In recommending termination, case manager Monroe informed the juvenile court that both children were found in a poor state of health when initially removed from Mother's care. Monroe further confirmed that O.S. tested positive for cocaine, was suffering from symptoms of withdrawal, and "was kind of a spastic newborn." Tr. p. 59. G.S., who was two years old at the time, was likewise described as "a very sickly child." Id. He was "very small," had pneumonia, did not respond to his own name, and could not give more than "one-word responses." Id.

When asked to describe how the children were currently doing in foster care, current LCDCS case manager Geralyn Martin ("Martin") testified that the children had "improved greatly," that their health problems were "starting to subside," and that they were living together and thriving in foster care. Id. at 89. Martin went on to testify that she believed the children's progress was due in large part to the "stability they now have

15

with [foster mother]." Id. at 91. Additionally, Martin explained that the children "need to grow up in a drug[-]free environment," with a parent that can "protect them" and "ensure that their medical needs are going to be met, [and] that they will have consistency, structure, [and] nurturance . . . ." Id. at 102.

A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287 (Ind. Ct. App. 2002). For all these reasons, including Mother's unresolved mental health and substance abuse issues, coupled with the testimony from Martin and Monroe and other service providers recommending termination of the parent-child relationships, we conclude that the juvenile court's determination that termination of parental rights is in G.S.'s and O.S.'s best interests is supported by the evidence.

### III. Satisfactory Plan

Finally, we turn to Mother's assertion that LCDCS failed to show it has a satisfactory plan for the future care of the children. Indiana Code section 31-35-2-4(b)(2)(D) provides that before a juvenile court may terminate a parent-child relationship, it must find there is a satisfactory plan for the future care and treatment of the child. Id.; see also D.D., 804 N.E.2d at 268. It is well-established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. Id. Here, LCDCS's plan is for G.S. and O.S. to be adopted by their current foster mother who has expressed a desire to

do so. This plan provides the juvenile court with a general sense of the direction of the children's future care and treatment. LCDCS's plan is therefore satisfactory. See id. (concluding that State's plan for child to be adopted by current foster parents or another family constituted suitable plan for future care of child).

This Court will reverse a termination of parental rights "'only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made.'" In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

VAIDIK, J., and BARNES, J., concur.